# United States Court of Appeals
## For the First Circuit

No. 03-2356

BYRON A. CROWE,

Plaintiff, Appellee,

v.

J.P. BOLDUC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

Michael J. Gartland, with whom Lee H. Bals and Marcus, Clegg
& Mistretta, P.A. were on brief, for appellant.
    John M.R. Paterson, with whom Jennifer D. Sawyer and
Bernstein, Shur, Sawyer & Nelson were on brief, for appellee.

April 22, 2004

**SELYA**, **Circuit Judge**. This is, as Yogi Berra might say, déjà vu all over again. Not long ago, we affirmed a verdict awarding plaintiff-appellee Byron A. Crowe $86,381.98 in his indemnity action against defendant-appellant J.P. Bolduc. Crowe v. Bolduc, 334 F.3d 124 (1st Cir. 2003) (Crowe II). Flush from his appellate triumph, Crowe repaired to the district court and successfully petitioned for incremental awards of prejudgment interest and attorneys' fees. Bolduc challenges both awards.

The prejudgment interest issue requires us to revisit prior circuit precedent, specifically, Aubin v. Fudala, 782 F.2d 287 (1st Cir. 1986). Aubin held that the proper vehicle for the initial assessment of mandatory prejudgment interest, wholly omitted from an earlier judgment, is a motion to correct the judgment pursuant to Fed. R. Civ. P. 60(a) rather than a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e). Id. at 290. Recognizing that an intervening Supreme Court decision has undermined Aubin's resolution of this point, we overrule that determination and hold that, in such circumstances, resort should be made to Rule 59(e).[1] However, since Crowe justifiably relied

_____

[1]Following the procedure described in Gallagher v. Wilton Enterprises, Inc., 962 F.2d 120, 124 n.4 (1st Cir. 1992) (per curiam), the proposed panel opinion in this case has been circulated to all active judges of the court prior to publication, and none has interposed an objection to the panel's overruling of Aubin. We caution that this procedure does not convert this opinion to an en banc decision nor does it preclude a suggestion of rehearing en banc on any issue in the case, whether or not related to the panel's treatment of Aubin.

upon, and faithfully followed, existing circuit precedent, we direct that this holding operate in a purely prospective fashion. Consequently, we affirm the award of prejudgment interest even though Crowe failed to file his motion within the ten-day period delineated in Rule 59(e).

The remaining question involves Crowe's entitlement vel non to attorneys' fees. The answer to that question depends principally on contractual arrangements entered into by and between the parties. Fairly read, those agreements authorize fee-shifting in the circumstances of this case. Thus, we affirm the award of attorneys' fees as well.

## I.   BACKGROUND

We do not write on a pristine page. This appeal is an offspring of a transaction that has been mired in litigation for several years. That litigation has inspired two published circuit court opinions, each of which recounts pertinent aspects of the factual background. See Crowe II, 334 F.3d at 128-30; Achille Bayart & Cie v. Crowe, 238 F.3d 44, 45-46 (1st Cir. 2001) (Crowe I). We refer the reader who hungers for further details to those opinions. For present purposes, we offer only an overview.

Crowe was the president and sole shareholder of Andrew Crowe & Sons, Inc. d/b/a Crowe Rope Company (Crowe Rope). Once an industry leader, Crowe Rope fell upon hard times. By December of 1995, the company owed over $8,600,000 to its prime commercial

lender, Fleet Bank. To secure this debt, Fleet held mortgages on, and security interests in, all the assets of Crowe Rope. When Crowe Rope defaulted on its obligations to Fleet, Bolduc emerged as a white knight.

Acting through a web of holding companies, Bolduc purchased the Fleet debt and stepped into Fleet's shoes as Crowe Rope's principal secured creditor. Crowe Rope then transferred all of its assets to one of Bolduc's nominees (the Operating Company) and Crowe and his wife transferred some business-related real estate held in their names to another of Bolduc's nominees. In exchange, Bolduc and/or the Operating Company agreed to (i) cancel the existing debt and release the Crowes from any personal liability, (ii) pay the Crowes (or the survivor of them) a $40,000 lifetime annuity, (iii) pay Crowe a $60,000 one-time fee for consulting services and for agreeing not to compete, and (iv) hold the Crowes harmless should creditors cry foul. We discuss below the various documents that memorialize this transaction.

The deal left Crowe Rope's trade creditors barking up a defoliated tree. On May 6, 1998, one such creditor, Achille Bayart & Cie, brought suit against the Crowes seeking to set aside the $40,000 annuity as a fraudulent transfer. See Crowe I, 238 F.3d at 46. After some preliminary skirmishing, not relevant here, the district court granted the Crowes' motion for judgment as a matter of law. We affirmed that decision. Id. at 49.

-4-

In Crowe's view, certain provisions in the agreements between the parties bound Bolduc to defray the legal fees that he had expended in defending Crowe I. Accordingly, he brought suit against Bolduc in a Maine state court to recoup those fees. Bolduc removed the case to the district court based on diversity of citizenship and the existence of a controversy in the requisite amount. 28 U.S.C. §§ 1332(a)(1), 1441(a). The parties proceeded by consent before a magistrate judge. See id. § 636(c). After a two-day trial, a jury accepted Crowe's view of the arrangement and awarded him $86,381.98. Crowe II, 334 F.3d at 130. We affirmed that award on July 3, 2003. Id. at 139.

That did not end the case, but, rather, set the stage for further proceedings. On July 25, 2003, Crowe invoked Fed. R. Civ. P. 60(a) and moved to correct the judgment by adding prejudgment interest. He also moved for an award of attorneys' fees pursuant to Fed. R. Civ. P. 54(d)(2). The magistrate judge granted both motions, tacking on $3,437.44 in prejudgment interest and $67,872.50 in attorneys' fees.[2] This appeal ensued.

## II. PREJUDGMENT INTEREST

Bolduc's challenge to the prejudgment interest award turns on abstract questions of law. We therefore review the lower court's decision de novo. Disola Dev., LLC v. Mancuso, 291 F.3d

---

[2]The fee award included some expenses incurred by Crowe's lawyers in prosecuting Crowe II. We see no need to differentiate between the components of that award for purposes of this opinion.

83, 86 (1st Cir. 2002); R.I. Charities Trust v. Engelhard Corp., 267 F.3d 3, 5 (1st Cir. 2001).

When a plaintiff obtains a jury verdict in a diversity case in which the substantive law of the forum state supplies the rules of decision, that state's law governs the plaintiff's entitlement to prejudgment interest. See R.I. Charities Trust, 267 F.3d at 8; Roy v. Star Chopper Co., 584 F.2d 1124, 1135 (1st Cir. 1978). Maine law broadly entitles prevailing civil plaintiffs to prejudgment interest as a matter of right. Me. Rev. Stat. Ann. tit. 14, § 1602 (repealed and replaced by Me. Rev. Stat. Ann. tit. 14, § 1602-B, effective for judgments entered on or after July 1, 2003); Sawyer v. Walker, 572 A.2d 498, 499 (Me. 1990). It is, therefore, beyond serious question that Crowe's success in Crowe II carried with it an entitlement to prejudgment interest so long as that entitlement was properly preserved.

Despite Crowe's right to recover prejudgment interest, the district court's judgment in Crowe II made no mention of interest, but simply confirmed the damage award. That judgment entered no later than November 12, 2002.[3] On July 25, 2003 — more

---

[3]The district court originally entered judgment on September 19, 2002 in the amount of the jury verdict ($86,381.98). On November 12, 2002, the court entered an amended judgment in the same amount following the denial of Bolduc's post-trial motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). For consistency's sake, we refer throughout to the judgment entered on November 12, 2002 (noting, however, that it makes no difference here which of these two judgments started the clock for purposes of filing other post-trial motions).

-6-

than eight months thereafter — Crowe filed a motion to augment the judgment by adding prejudgment interest. Crowe brought this motion under Fed. R. Civ. P. 60(a), which provides in pertinent part that "[c]lerical mistakes in judgments . . . and errors therein arising from oversight or omission may be corrected by the court at any time . . . on the motion of any party."

Bolduc opposed Crowe's motion, asseverating that Rule 60(a) was the wrong procedural vehicle and that recourse to the proper vehicle — Fed. R. Civ. P. 59(e) — was time-barred. Rule 59(e) governs motions to alter or amend a judgment and explicitly provides that all such motions "shall be filed no later than 10 days after entry of judgment." Because Crowe had filed his motion to add prejudgment interest more than 250 days after the entry of judgment, the ten-day deadline, if applicable, had long since expired.

The district court rejected Bolduc's importunings. It found this case "indistinguishable in all material respects" from our earlier decision in Aubin, 782 F.2d at 290. Relying principally on that precedent, the court anointed Rule 60(a) as an acceptable vehicle for adding prejudgment interest and adjudged Crowe's motion timely. Aubin, however, was a weaker reed than the district court thought. We explain briefly.

In Aubin, the plaintiff won a jury verdict in New Hampshire's federal district court and, thus, became entitled to

-7-

prejudgment interest as a matter of New Hampshire law.  Id. at 289 (citing N.H. Rev. Stat. Ann. § 524:1-b).  The court entered a judgment that referred only to the amount of damages and the plaintiff subsequently moved to add prejudgment interest.  The district court allowed the motion even though it had been filed more than ten days after entry of the judgment.  We affirmed, holding that a Rule 60(a) motion was an appropriate vehicle for correcting a final judgment that omitted mandatory prejudgment interest and that, therefore, the plaintiff's motion was not subject to the temporal strictures of Rule 59(e).  Id. at 290.

This court decided Aubin in 1986.  Three years later, the Supreme Court decided Osterneck v. Ernst & Whinney, 489 U.S. 169 (1989).  In that case, the Court held that a motion to augment a previously entered judgment by adding discretionary prejudgment interest is properly classified as a motion to alter or amend the judgment, and, thus, must be brought under Rule 59(e).  Id. at 175. The Court reasoned from the premise that the use of Rule 59(e) is appropriate when a motion involves "reconsideration of matters properly encompassed in a decision on the merits."  Id. at 174 (quoting White v. N.H. Dep't of Emp. Sec., 455 U.S. 445, 451 (1982)).  It then noted two considerations pertinent to discretionary prejudgment interest:  (i) prejudgment interest traditionally has been regarded as a make-whole remedy and as a part of the plaintiff's complete compensation, and (ii) motions to

add prejudgment interest to a verdict neither raise issues "wholly collateral to the judgment in the main cause of action" nor require an inquiry "wholly separate from the decision on the merits."  Id. at 175-76 (citations and internal quotation marks omitted).  Based largely on these two considerations, the Court concluded that motions for the addition of discretionary prejudgment interest involve "the kind of reconsideration of matters within the merits of a judgment to which Rule 59(e) was intended to apply."  Id. at 176.  And as a policy matter, requiring resort to Rule 59(e) for this purpose "further[s] the important goal of avoiding piecemeal appellate review of judgments."  Id. at 177 (discussing Fed. R. App. P. 4(a)(4)).[4]

Strictly speaking Osterneck is distinguishable.  The Court there was dealing with a belated attempt to secure a discretionary award of prejudgment interest.  See id. at 175.  Crowe seizes on this distinction, pointing out that this case — like Aubin — involves a motion to add mandatory prejudgment interest.  That distinction carries little weight.  For one thing, the considerations relied upon by the Osterneck Court apply with equal force to augmentations involving mandatory prejudgment interest.  For another thing, the Osterneck Court took pains to note:

---

[4]Fed. R. App. P. 4(a)(4) renders ineffective notices of appeal filed during the pendency of a timely Rule 59(e) motion.

-9-

> We do not believe the result should be different where prejudgment interest is available as a matter of right. It could be argued that where a party is entitled to prejudgment interest as a matter of right, a reexamination of issues relevant to the underlying merits is not necessary, and therefore the motion should be deemed collateral in the sense we have used that term. However, mandatory prejudgment interest, no less than discretionary prejudgment interest, serves to "remedy the injury giving rise to the [underlying] action," and in that sense is part of the merits of the district court's decision. Moreover, . . . "[w]hat is of importance here is not preservation of conceptual consistency in the status of a particular [type of motion] as 'merits' or 'nonmerits,' but rather preservation of operational consistency and predictability . . . ." "Courts and litigants are best served by the bright-line rule . . . that a motion for prejudgment interest implicates the merits of the district court's judgment."

Id. at 176 n.3 (citations omitted).

To be sure, this footnote is dictum, but it is much more than an offhand comment. We have recognized before, and today reaffirm, that "[c]arefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative." United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993); accord McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991). The Osterneck footnote is purposeful, straightforward, and soundly reasoned. All nine Justices subscribed to it. And, finally, the footnote remains unblemished; it has not been scarred by any subsequent Supreme Court

-10-

pronouncement.  In these circumstances, we are unwilling to turn a blind eye to the clear import of footnote 3.

Following Osterneck's lead, we conclude that Rule 59(e) is the proper procedural vehicle for motions seeking to revise a judgment to include an initial award of prejudgment interest (whether mandatory or discretionary).  This holding aligns us with the three other courts of appeals that have addressed the question post-Osterneck.  The Tenth Circuit has held squarely, as do we, that Rule 59(e), rather than Rule 60(a), is the proper vehicle for motions seeking an initial award of mandatory prejudgment interest, Capstick v. Allstate Ins. Co., 998 F.2d 810, 813 (10th Cir. 1993), and two other circuits have indicated their assent to that proposition, see Pogor v. Makita U.S.A., Inc., 135 F.3d 384, 388 (6th Cir. 1998) (dictum); Kosnoski v. Howley, 33 F.3d 376, 378 (4th Cir. 1994) (dictum).[5]  To the extent that our earlier decision in Aubin is inconsistent with this holding, it is overruled.  See supra note 1.

---

[5]We use the adjective "initial" inasmuch as we limit our holding to those cases in which the judgment, prior to the attempted revision, is altogether silent as to prejudgment interest.  We do not address the somewhat different scenario in which the judgment awards interest but either fails to quantify the amount or erroneously computes the amount.  It may well be that, in those circumstances, Rule 60(a) is an appropriate vehicle for a subsequent motion to fix the size of the interest award.  See, e.g., Pogor, 135 F.3d at 388; Kosnoski, 33 F.3d at 379.  This case does not pose that question, and we leave it for another day.

Despite this square holding, our journey must continue. Crowe asserts that he nonetheless was entitled to rely upon Aubin because that decision had not been expressly overruled (and, indeed, had been followed by the federal district court in Maine even after the Osterneck decision). Any abrogation of Aubin should, he suggests, be purely prospective, and should not have force in this case.

As a general rule, judicial decisions are retroactive in the sense that they apply both to the parties in the case before the court and to all other parties in pending cases. James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 535 (1991); Amann v. Town of Stow, 991 F.2d 929, 934 (1st Cir. 1993) (per curiam). This rule is absolute in the criminal context. Griffith v. Kentucky, 479 U.S. 314, 328 (1987). In civil cases, however, the rule admits of a narrow equitable exception. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07 (1971); see also Am. Trucking Ass'ns, Inc. v. Smith, 496 U.S. 167, 178 (1990) (plurality op.) (reaffirming preeminence of Chevron Oil in the civil context post-Griffith).

The exception works along the following lines. A court in a civil case may apply a decision purely prospectively, binding neither the parties before it nor similarly situated parties in other pending cases, depending on the answers to three questions. First: does the court's decision announce a new and unexpected rule of law, by, say, overruling settled precedent on which the

-12-

parties may have relied? Second: does the history of the jurisprudence in the affected area of the law, together with the new rule's purpose and effect, counsel for or against retroactive application? Third: would retroactive application give rise to a substantial inequity? <u>Chevron Oil</u>, 404 U.S. at 106-07. Selective prospectivity, however, is not permissible; if a new rule is applied to the parties in the rule-creating case, then it must be applied retroactively to similarly situated parties in all pending cases. <u>Harper</u> v. <u>Va. Dep't of Tax.</u>, 509 U.S. 86, 97 (1993). In a civil case, then, a court has only two available options: pure prospectivity or full retroactivity. <u>Glazner</u> v. <u>Glazner</u>, 347 F.3d 1212, 1218 (11th Cir. 2003) (en banc); <u>George</u> v. <u>Camacho</u>, 119 F.3d 1393, 1399 n.9 (9th Cir. 1997) (en banc).

We find this case a suitable candidate for purely prospective application of a new rule. In jettisoning <u>Aubin</u>, we set aside binding circuit precedent that authorized submission of initial motions for mandatory prejudgment interest under Rule 60(a). Although the <u>Osterneck</u> dictum presaged the demise of the <u>Aubin</u> rule, <u>Osterneck</u> did not expressly abrogate <u>Aubin</u>. Thus, <u>Aubin</u> remained good law in this circuit. Bolduc has pointed to no opinion at either the circuit or district level that raised the possibility that <u>Aubin</u> was lingering on life support. Typical cases, such as the decisions in <u>Mirra Co.</u> v. <u>Maine School Administrative District No. 35</u>, No. 01-165, 2003 WL 21026786, at *2

-13-

(D. Me. May 6, 2003) and <u>Lewis</u> v. <u>City of Brockton</u>, Civ. No. 85-1158, 1990 WL 26840, at *1 (D. Mass. Feb. 23, 1990), cite confidently to <u>Aubin</u>, and proceed to apply it with no mention of the <u>Osterneck</u> dictum. Under these circumstances, Crowe's reliance on <u>Aubin</u> was understandable and the first prong of the <u>Chevron Oil</u> test is, therefore, satisfied. <u>See</u> <u>Glazner</u>, 347 F.3d at 1220; <u>George</u>, 119 F.3d at 1401.

The second <u>Chevron Oil</u> factor also counsels against retrospective application here. The newly minted requirement that mandatory prejudgment interest motions must be brought pursuant to Rule 59(e) is meant to provide parties with clear direction and certainty in litigating their claims. Applying the rule retroactively to parties who justifiably have relied on a previous rule does not advance any discernible goal.

The final <u>Chevron Oil</u> signpost points in the same direction. We think that it would be patently unfair to subject a party to a forfeiture for assiduously following binding circuit precedent. <u>See</u> <u>George</u>, 119 F.3d at 1399 ("<u>[N]o</u> court has ever applied a change to a procedural rule in a manner that serves to forfeit a litigant's substantive rights when that litigant had fully complied with the provisions of the rule as it existed at the time he acted.") (emphasis in original); <u>see</u> <u>also</u> <u>Wagner</u> v. <u>Daewoo Heavy Indus. Am. Corp.</u>, 314 F.3d 541, 544-45 (11th Cir. 2002) (en

-14-

banc) (refusing to apply new rule restricting right to amend pleadings retroactively).

Our conclusion in favor of purely prospective application fits well with cases that change the allotted time in which to make a filing, but refuse to apply the new rule retroactively. For example, when a decision replaces a limitations period previously established in circuit precedent with a new, less generous rule of timeliness, courts regularly have refused to apply the new rule retroactively if doing so would bar an action timely brought under the prior law. See, e.g., St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 608-09 (1987); Chevron Oil, 404 U.S. at 107. Another example is George, in which the Ninth Circuit overturned circuit precedent that had allowed litigants in the Northern Mariana Islands an additional seven days within which to file notices of appeal. Despite the fact that the overruled precedent was based on a flat misreading of the applicable local rule, the George court made its decision purely prospective and refused to apply the new interpretation to bar the appellant's appeal. 119 F.3d at 1395-96.

That ends this aspect of the matter. Although we hold that motions to augment previously entered judgments by adding mandatory prejudgment interest must be brought under Rule 59(e) and therefore must meet that rule's ten-day filing requirement, we direct that our holding be applied in a purely prospective manner. Consequently, this holding does not affect Crowe. And because

-15-

Crowe's motion was timely under then-binding circuit precedent, we affirm the district court's award of prejudgment interest.

## III.  ATTORNEYS' FEES

We turn next to the decision awarding Crowe the attorneys' fees incurred in prosecuting Crowe II.  The American rule, followed in Maine, generally requires that each party compensate his or her own lawyers.  Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975); Jackson v. Inhabitants of Searsport, 456 A.2d 852, 855-56 (Me. 1983).  This rule, like almost every general rule, admits of various exceptions.  One exception is that prevailing parties are entitled to attorneys' fees if the parties agreed by contract to a fee-shifting arrangement.  Jackson, 456 A.2d at 856.

In this case, the district court concluded that the documents memorializing the transaction authorized the shifting of fees.  Bolduc challenges this conclusion.

There are three agreements which, taken together, govern the arrangements between Crowe and Bolduc.  The centerpiece is an agreement dated December 8, 1995 among the Crowes, Bolduc, and the Operating Company.  In it, Crowe agreed to transfer all of Crowe Rope's assets to the Operating Company and the real estate to another of Bolduc's nominees in satisfaction of the Fleet debt. The same agreement bound Bolduc and the Operating Company to pay the Crowes the $40,000 lifetime annuity and the $60,000

consulting/noncompetition fee. The second document, executed on the same date, is a letter agreement between the Crowes and Bolduc. The letter agreement is, broadly speaking, an indemnity agreement. It imposed two obligations on Bolduc. First, it bound him to hold the Crowes harmless against any loss in the event that a court decree interrupted the payment of either the $40,000 annual stipend or the $60,000 one-time fee. Second, it obligated Bolduc to defend the Crowes against creditor suits or, alternatively, reimburse them for the reasonable cost of defending such actions. See Crowe II, 334 F.3d at 135-38 (approving a jury finding that the letter agreement imposed that obligation on Bolduc).

The third document is a guaranty (the Guaranty), executed one week after the other two agreements. The Crowes, Bolduc, and the Operating Company are parties to the Guaranty. In the portion of the Guaranty that is of interest here, Bolduc guaranteed payment to the Crowes of certain obligations due to them under the December 8 agreements.

This appeal centers on the district court's recension of the Guaranty. In this inquiry, Maine law supplies the substantive rules of decision (the agreements so stipulate, and the parties concede the point). The district court held that the Guaranty was, in pertinent part, unambiguous, and that the indemnity provisions encompassed the costs incurred by Crowe. Whether a contract is unambiguous presents a question of law subject to plenary review.

Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).  So too the interpretation of unambiguous contract terms.  Id.

The interpretive principles that guide our decision are familiar.  A guarantee is simply a specialized form of contract and, as such, is subject to the same canons of construction that apply to other types of contracts.  Handy Boat Serv., Inc. v. Prof'l Servs., Inc., 711 A.2d 1306, 1308 (Me. 1998).  Thus, the language of the Guaranty should be interpreted "to effect the parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished."  Id. Where, as here, the parties entered into several contracts in the same time frame and for the purpose of completing a unitary transaction, the contracts ought to be construed together.  Bumila v. Keiser Homes of Me., Inc., 696 A.2d 1091, 1094 (Me. 1997).

With these tenets in mind, we turn to the specific provisions at issue here.  Pertinently, the Guaranty provides in paragraph 4:

> Bolduc hereby unconditionally and irrevocably guarantees the payment by the Operating Company of all payments due to the Crowes or either of them from the Operating Company under and on account of the December 8, 1995 Agreement and pursuant to a certain letter agreement also dated December 8, 1995 from Bolduc to the Crowes, a true copy of which is attached hereto and made a part hereof, as and when said payments are due, including without limitation, all compensation for

-18-

> noncompetition and consulting services and
> [annuity] payments . . . .

The Guaranty also includes a fee-shifting provision stating that "Bolduc agrees to pay all o [sic] the Crowe's [sic] reasonable legal fees, costs, and expenses in collecting the Obligations or in enforcing this Guaranty." The question before us reduces to whether this fee-shifting provision, when read together with the remainder of paragraph 4 and the December 8 agreements, obligates Bolduc to pay Crowe the legal fees incurred in prosecuting Crowe II.

The parties offer competing interpretations of the fee-shifting provision. Crowe begins from the premise that he is entitled to recoup legal fees expended in "enforcing this Guaranty." In paragraph 4, Bolduc guarantees the making of payments "pursuant to [the] letter agreement." One payment due under the letter agreement was for the cost of defending Crowe I. See Crowe II, 334 F.3d at 138. Since Bolduc initially refused to make that payment and Crowe only recovered the sums due after bringing suit, Crowe II should be characterized as an action to enforce Bolduc's obligation under paragraph 4. Hence, Crowe is entitled to recover legal fees expended in prosecuting that action.

Bolduc begins from the same premise — that Crowe is entitled to legal fees expended in "enforcing this Guaranty" — but reaches the opposite conclusion. Under paragraph 4, Bolduc "guarantees the payment by the Operating Company of all payments

-19-

due to the Crowes or either of them from the Operating Company under and on account of the December 8, 1995 Agreement and pursuant to [the] letter agreement." Bolduc reads this language as restricting his liability to payments due from the Operating Company to the Crowes. Since Crowe II was an action to collect a payment Bolduc individually owed Crowe under the letter agreement (not to collect a payment due from the Operating Company), it should not be characterized as an action to enforce the Guaranty. Hence, Crowe is not entitled to recover attorneys' fees for prosecuting that action.

At first blush, it may seem that we are faced with an ambiguous contract (although neither Crowe nor Bolduc subscribes to that view).[6] On further examination, however, that is not the case. After all, a contract need not "negate every possible construction of its terms in order to be unambiguous." Waxler v. Waxler, 458 A.2d 1219, 1224 (Me. 1983). Nor is a contract ambiguous "merely because a party to it . . . disputes an interpretation that is logically compelled." Blackie, 75 F.3d at 721. In the last analysis, a contract is ambiguous only when its terms, fairly construed, yield more than one reasonable

---

[6]Leaving considerations of waiver to one side, such a conclusion might have consequences. When a contract is ambiguous, its interpretation becomes a question of fact, and the court typically will look to extrinsic evidence to determine the parties' intent. See Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989); Acadia Ins. Co. v. Buck Constr. Co., 756 A.2d 515, 517 (Me. 2000).

-20-

interpretation.  <u>Lexington Ins. Co.</u> v. <u>Gen. Accid. Ins. Co.</u>, 338 F.3d 42, 47 (1st Cir. 2003); <u>Blackie</u>, 75 F.3d at 721.

In this instance, Bolduc's interpretation of the fee-shifting provision is unreasonable.  A contract ordinarily should be interpreted so as to give force to all of its provisions. <u>Blackie</u>, 75 F.3d at 722; <u>Acadia Ins. Co.</u> v. <u>Buck Constr. Co.</u>, 756 A.2d 515, 517 (Me. 2000).  It follows that an inquiring court should, whenever possible, avoid an interpretation that renders a particular word, clause, or phrase meaningless or relegates it to the category of mere surplusage.  <u>Acadia Ins.</u>, 756 A.2d at 517. Here, the fatal flaw in Bolduc's argument is that it renders nugatory paragraph 4's reference to the letter agreement.

According to Bolduc, his only obligation under paragraph 4 is to ensure payments due from the Operating Company.  This interpretation overlooks the fact that paragraph 4 applies not only to payments "under and on account of the December 8, 1995 Agreement" but also to payments required "pursuant to [the] letter agreement."  The Operating Company is liable, under the main December 8 agreement, to make the annuity and consulting/noncompetition payments, and the Guaranty clearly applies to those payments.  But the Operating Company is not liable for <u>any</u> payments under the letter agreement (it is not even a party to that agreement).  If we were to accept Bolduc's thesis, paragraph 4's reference to payments "pursuant to [the] letter

agreement" would be meaningless.  That would contravene the rule that, whenever possible, contracts should be construed to give effect to every word, clause, and phrase.  See Blackie, 75 F.3d at 722; Acadia Ins., 756 A.2d at 517.

Bolduc has offered nothing that would square his construction of the Guaranty with the reference to the letter agreement; he would simply have us read that reference out of the contract.  But we are not so struthious as to ignore plain language, nor are we at liberty to disregard terms purposefully inserted into an agreement by experienced businessmen.  See Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 856 (1st Cir. 1987).

These principles apply with especial force when, as now, an alternative reading exists that gives meaning to every word, clause, and phrase.  Blackie, 75 F.3d at 722.  Crowe's interpretation of paragraph 4 is an entirely plausible reading of the language chosen by the parties.  Because there is no room for any reasonable difference of opinion as to the meaning of paragraph 4 in the context of this case, we hold that the Guaranty unambiguously covers the indemnity payment due under the letter agreement. That seals the deal: Crowe's successful prosecution of Crowe II and his collection of a payment secured by the Guaranty

triggered Bolduc's duty to defray Crowe's attorneys' fees.  The district court did not err in awarding those fees to Crowe.[7]

**IV.  CONCLUSION**

We need go no further.  For the reasons elucidated above, we affirm both the award of prejudgment interest and the award of attorneys' fees.

**Affirmed**.

---

[7]Crowe's motion for fees was made pursuant to Fed. R. Civ. P. 54(d)(2), and the timing of the motion was dictated by the terms of an agreement between the parties.  In this proceeding, Bolduc has not questioned either the amount of the fee award or the procedural vehicle used to obtain it.  We therefore eschew any discussion of these matters.